CITY NAT. BANK OF NORFOLK

*v.*

PEED *et al.*

(*Supreme Court of Appeals of Virginia, Jan. 12, 1899.*)

[32 S. E. Rep. 34.]

**Payment by Mistake—Right to Recover Back—Ignorance of Material Facts.—Case at Bar.**

A corporation, of which the plaintiff firm was a stockholder, gave its note for money borrowed of defendant, and, under an arrangement with its stockholders, pledged their stock notes as security therefor. Subsequently the stockholders, to release the company from such indebtedness, made their several notes, payable directly to defendant, in lieu of their stock notes, which were payable to the company, and placed them in the hands of an agent to procure the transfer of such indebtedness from the company to the individual stockholders. Without fully disclosing to defendant his instructions, such agent took up the company's note, in exchange for such individual notes, but left in defendant's possession the stock notes for which they were intended to be substituted. Some time after the payment of the note given by plaintiff, defendant demanded payment of the stock note made by such firm to the company, claiming to P., who had attended to such business on behalf of his firm, that it was held as collateral security for certain indebtedness of the company to defendant; and P., thereupon, under the supposition that such was the fact, gave to defendant a new note, for the amount due thereon, in the name of the firm. J., one of the members of such firm, who had no knowledge of the circumstances under which the several notes referred to had been given, afterwards, on demand of defendant, made a payment on such new note; supposing, from the fact that defendant held it and demanded payment thereof, that it was valid: *held*, that plaintiff was entitled to recover back, as paid under a material mistake of fact, the money so paid on such new note.

**Same—Same—Same—Same.**

The right to recover back money paid by mistake was not precluded

by the circumstance that plaintiff might, by the exercise of greater diligence, have learned the material facts involved in the alleged mistake, where his ignorance of such facts was in good faith.

Appeal from the law and chancery court of city of Norfolk.

·Assumpsit by Peed & Son against the City National Bank of Norfolk. From a judgment in favor of plaintiffs, defendant appeals. Affirmed.

*G. M. Dillard*, for appellant.

*Whitehurst & Hughes*, for appellees.

BUCHANAN, J., delivered the opinion of the court.

This is an action of assumpsit brought by Peed & Son against the City National Bank of Norfolk to recover back money alleged to have been paid under a mistake.

The material facts upon which the plaintiffs based their right to recover are as follows :

On the 19th day of November, 1894, at a called meeting of the directors and stockholders of the Union Milling Company, it was determined that more money was needed to conduct the business of the company advantageously, and that it should borrow an additional sum from the defendant bank, to which it was then indebted by note in the sum of $2,000. To accomplish this, it was agreed, and a resolution passed to that effect, that each stockholder should take an additional block of stock to the extent of $1,000, except Hall, the secretary of the company, who should only take $500, and that each stockholder who took should give his note to the company for an amount equal to one-half of all the stock in his name, and that these notes should be attached, as collateral security, to the note given to the bank for the additional loan. Six of the stockholders took additional stock, and all of them executed their several notes therefor to

the milling company for $1,000 each, except Hall, who executed his note for $500. The company thereupon borrowed from the defendant bank the sum of $5,500, gave its sixty-days nego-tiable note therefor, and deposited with the bank the above-mentioned stock notes, with the stock attached, which were payable on demand, and amounted to the sum of $5,500, as col-lateral security for its payment, and the payment of any other engagement which it might enter into with the defendant. The $5,500 note was renewed from time to time until July 31, 1895, when it and the $2,000 note were consolidated, and a new note for $7,500 given. The $5,500 note was taken up by the milling company, but the $2,000 note, which was payable on demand, and which was indorsed by Mahoney and others, was deposited with the defendant, along with the $5,500 stock notes and stock held by the bank as collateral, and upon the same conditions.

On September 25, 1895, at a called meeting of the stock-holders of the milling company, Hall, the secretary of the com-pany, made a statement to the effect that all efforts to secure additional stock had been rendered abortive, owing to the then existing indebtedness of the company to the defendant, and on his motion it was then "resolved that, if the bank [the defendant] would release the Union Milling Company of the $5,500 of its indebtedness, that each stockholder give his personal note to the bank, obligating himself to pay the same"; the notes having been previously given by the stockholders to the Union Milling Company, which company had received the money from the bank on said notes. A committee was thereupon appointed, consisting of Hall and another, to wait upon the defendant, and see if its officers would consent to accept such notes in lieu of the note of the company. Hall took the notes executed under the resolution to the defendant bank, and stated to its cashier that it was the wish of the milling company to retire $5,500 of its indebtedness to the defendant, and, in order to accomplish that end, it proposed to with-draw the $7,500 note, and in lieu thereof the bank should re-

Va Dec—40

tain the $2,000 note indorsed by Mahoney and others, and take the individual notes of Peed and others amounting to $5,500, payable directly to the defendant. After some hesitation the cashier acceded to the arrangement, and it was perfected. The cashier was told that the object of the milling company in retiring its note of $7,500 was to enable it to get subscribers for its stock, but he was told nothing further of the contents of the resolution of September 25, 1895.

The note which Peed executed under the resolution of September 25, 1895, payable directly to the defendant, after several renewals, was paid by him. Some time afterwards the defendant demanded payment of the $1,000 note executed by him to the milling company, and which had been deposited with the defendant under the resolution of November 19, 1894. Peed, when the demand was made, claimed that he had paid that note ; but the defendant insisted that it held it as collateral security for the payment of the $2,000 note, and other indebtedness due from the milling company to the defendant. Peed thereupon stated to the president of the defendant bank that he supposed it to be correct, and a note for $1,113.95 (which was the amount, principal and interest, of the $1,000 note) was executed by the plaintiffs to the defendant. There was evidence tending to show that, at the time the note for $1,113.95 was given, the $1,000 note, and renewals of it, payable directly to the defendant, which Peed had taken up, had been laid aside, and that he did not know where they were, and that at that time the condition of Peed was such that he did not attend to business ; that Jordon, one of the members of the firm of Peed & Son, the plaintiffs, paid $791.95 on the $1,113.95 note, but at the time he paid it he did not know any of the facts and circumstances connected with the giving of the note by Peed to the milling company, or the giving of his note payable to the defendant, but supposed that the first-named note was due and unpaid, from the fact that the defendant held and demanded payment of it. It is to recover the sum thus paid that this action was instituted.

The evidence shows very clearly that when Peed and the other stockholders of the milling company executed their notes under the resolution of September 25, 1895, it was their intention, and the intention of the milling company, that the notes were to be in lieu of the notes for like amounts executed by them under the resolution of November 19, 1894.  The resolution of September 25th shows this upon its face, and, as between the stockholders and their company, there was no consideration for the latter, except the stock for which the former notes were given.  It is clear, therefore, unless the defendant had superior rights to the company, that when Peed paid his note executed under the resolution of September 25, 1895, he was under no further liability to either the company or the defendant on account of the note executed by him under the resolution of November 19, 1894.  It is true that the defendant, when it agreed to accept the stockholders' notes made payable directly to it in lieu of a like amount of the company's indebtedness, did not know that these notes were to be in lieu of the notes given under the resolution of November 19, 1894, and which it held as collateral security for the payment of the debt of the company, which it surrendered, and other debts held by it.  But does this want of knowledge place it in any better position than it would have been in if it had known all the facts ?  If it had known the facts, it might have declined to accept the notes ; but, if it had, it would have been in no better position than it is now.  Under the resolution of November 19, 1894, the milling company had become indebted to it in the sum of $5,500, for which it had the company's note and the notes of the stockholders for a like amount, with stock attached, as collateral security.  The milling company is insolvent, and its stock is worthless.  When the stockholders paid their notes held as collateral it would have satisfied $5,500 of the indebtedness of the company, and left unpaid the $2,000 note and the other indebtedness due from the company.  When they paid their notes executed directly to the defendant, and for

which it surrendered $5,500 of its indebtedness, the company still owed the defendant the same amount ; and it had the milling company and the worthless stock to look to for its payment. The indebtedness and the security in either case would have been the same.

But even if this were not so, and it appeared that the defendant had been injured by accepting the stockholders' notes for the company's indebtedness to the extent of $5,500, it would not affect the question.  It was the duty of the defendant, before accepting the notes of the stockholders, under the resolution of September 25, 1895, from Hall, the agent appointed by the company and its stockholders to effect the arrangement provided for in that resolution, to ascertain his authority; and, if it failed to do so, it acted at its peril. It is true, the notes were negotiable and in Hall's possession ; but he was no party to them, and the defendant, being the payee, could alone assign or transfer them.  Hall, therefore, had no right to deal with the notes, except as the agent of the makers.  The defendant, in dealing with him, was put upon its guard by that very fact, and dealt with him at its own risk.  It cannot rely for its protection upon Hall's assumption of authority,—upon what he disclosed, or failed to disclose, as to the purpose for which the notes were made,—but it must be regarded as receiving the notes in the light of the resolution under which Hall was acting.

It is clear, as we have seen, that the notes executed under the resolution of September 25, 1895, were to be in lieu of, not in addition to, those executed under the resolution of November 19, 1894 ; and, when they were paid, neither the milling company nor the defendant had the right to collect the notes executed under the last-mentioned resolution.

The instruction asked for by the defendant was properly refused by the court.  By it the jury were told, in effect, that a party cannot recover back money paid under a mistake of fact, if he could (if it was possible) before payment have put

himself in possession of all the material facts of the case. At one time it was held by the English courts that, in order to recover back money paid under a mistake of fact, it must be shown that the party seeking to recover it back must be guilty of no laches.   But that is no longer the rule in England, nor in many of the states of this country.   Mr. Minor states the rule as follows, and it seems to be sustained by reason and authority : That the right to recover money back paid by mistake is not "absolutely repelled by the circumstance that the payor had the means of knowledge in his power, if in truth, and in good faith, he did  not possess  a knowledge of the fact as to which the mistake is alleged.   Even forgetfulness of the fact will not preclude his actions, if the jury shall believe that it was a real and honest forgetfulness."   3 Minor, Inst. p. 373 ; Townsend v. Crowdy, 98 E. C. L. 477 ; Waite v. Leggett, 8 Cow. 195 ; Rutherford v. McIvor, 21 Ala. 750.

The instructions given by the court in lieu of those offered by both parties correctly stated the law, and fairly submitted the question to the jury ; and, the jury having found that the money sued for  was paid  under a  material mistake of fact, we cannot say that, under all  the facts  and circumstances of the case, their  verdict was  contrary  to the  law  and the evidence.

The judgment complained of must therefore be affirmed.

RIELY and CARDWELL, JJ., absent.